**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| KURT PHILLIPS, MICHAEL MANSON, THOMAS GRAHAM, AND AUSTIN KOHL, *on behalf of themselves and all others similarly situated*, | Case No. 1:23-CV-00022-DAE |
| Plaintiffs, | **CONSOLIDATED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| BAY BRIDGE ADMINISTRATORS, LLC, | |
| Defendant. | |

Plaintiff Kurt Phillips, Michael Manson, Thomas Graham, and Austin Kohl (collectively, "Plaintiffs") bring this Class Action Complaint against Bay Bridge Administrators, LLC ("Defendant" or "BBA"), on behalf of themselves individually and all others similarly situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their counsels' investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard personally identifiable information ("PII")[1] including, but not limited to, names,

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

1

address, dates of birth, Social Security numbers, driver's license numbers or state identification numbers, and protected health information ("PHI"), including medical and health insurance information (collectively, PII and PHI are "Private Information").

2.      Defendant is a third-party administrator of employee insurance plans headquartered in Austin, Texas. The company manages employee-offered insurance policies.

3.      To provide these services, and in the ordinary course of BBA's business, Defendant acquires, possesses, analyzes, and otherwise utilizes Plaintiffs' and putative Class Members' personally identifiable information.

4.      With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused and will continue to cause Plaintiffs and, at least, 251,000[2] other similarly situated persons in the massive and preventable cyberattack purportedly discovered by Defendant on September 5, 2022, by which cybercriminals infiltrated Defendant's inadequately protected network servers and accessed highly sensitive Private Information belonging to both adults and children, which was being kept unprotected (the "Data Breach").

5.      Plaintiffs further seek to hold Defendant responsible for not ensuring that the Private Information was maintained in a manner consistent with industry standards, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Privacy Rule (45 CFR, Part 160 and Parts A and E of Part 164), the HIPAA Security Rule (45 CFR Part 160 and Subparts A and C of Part 164), and other relevant standards.

---

[2]   *Data Breach Notifications*, Office of the Maine Attorney General, https://apps.web.maine.gov/online/aeviewer/ME/40/97bdbd01-0196-4fde-96f3-2ca59c0ad748.shtml (last visited June 13, 2023).

6.     On or about December 29, 2022, BBA finally notified state Attorneys General and many Class Members about the widespread Data Breach ("Breach Notice"). BBA waited almost three months before informing Class Members even though Plaintiffs and approximately 251,000 Class Members had their most sensitive personal information accessed, exfiltrated, and stolen,[3] causing them to suffer ascertainable losses in the form of the loss of the benefit of their bargain and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

7.     While Defendant claims to have discovered the Data Breach as early as September 5, 2022, Defendant did not begin informing victims of the Data Breach until December 29, 2022. Indeed, Plaintiffs and Class Members were wholly unaware of the Data Breach until they received letters from Defendant informing them of it in late December 2022 or January 2023.

8.     By acquiring, utilizing, and benefiting from the Private Information for its business purposes, Defendant owed or otherwise assumed common law, contractual, and statutory duties that extended to Plaintiffs and Class Members. These duties required Defendant to design and implement adequate data security systems to protect Plaintiffs and Class Members' Private Information in its possession and to keep Plaintiffs' and Class Members' Private Information confidential, safe, secure, and protected from unauthorized disclosure, access, dissemination, or theft.

9.     Defendant breached these duties by failing to implement adequate data security measures and protocols to properly safeguard and protect Plaintiffs' and Class Members' Private

---

[3] Ionut Arghire, *251k Impacted by Data Breach at Insurance Firm Bay Bridge Administrators*, SECURITYWEEK (Jan. 11, 2023), https://www.securityweek.com/251k-impacted-data-breach-insurance-firm-bay-bridge-administrators/ (last visited June 25, 2023).

Information from a foreseeable cyberattack on its systems that resulted in the unauthorized access and likely theft of Plaintiffs' and Class Members' Private Information.

10.     Currently, the full extent of the types of Private Information, the scope of the breach, and the root cause of the Data Breach are all within the exclusive control of Defendant, its agents, counsel, and forensic security vendors at this phase of the litigation.

11.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party.

12.     Upon information and belief, Defendant breached its duties and obligations in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendants' inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack, and (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

4

13.     Based on the type of sophisticated and targeted criminal activity, and the type of Private Information involved, Defendant's admission that the Private Information was accessed, it can be concluded that the unauthorized criminal third party was able to successfully target Plaintiffs' and Class Members' Private Information, infiltrate and gain access to Defendant's network, and exfiltrate Plaintiffs' and Class Members' Private Information, including names and Social Security numbers, for the purposes of utilizing or selling for use in future fraud and identity theft related cases.

14.     As a result of Defendant's failures and the Data Breach, Plaintiffs' and Class Members' identities are now at a current and substantial imminent and ongoing risk of identity theft.

15.     The risk of identity theft is not speculative or hypothetical but is impending and has materialized as there is evidence that Plaintiffs' and Class Members' Private Information was targeted, accessed, has been misused, and disseminated on the Dark Web. Indeed, there is evidence of actual misuse of the data following the Data Breach.

16.     As Defendant instructed, advised, and warned in its post Data Breach Notice Letter discussed below, Plaintiffs and Class Members must now closely monitor their financial accounts to guard against future identity theft and fraud. Plaintiffs' and Class Members' have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation efforts included and will include into the future: (a) reviewing financial statements; (b) changing passwords; and (c) signing up for credit and identity theft monitoring services. The loss of time and other mitigation costs are tied directly to guarding against and mitigating against the imminent risk of identity theft.

5

17.     Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) loss of time heeding Defendant's warnings and following its instructions in the Notice Letter; (g) deprivation of value of their Private Information; (h) invasions of their privacy; and (i) the continued risk to their Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

18.     Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to adequately protect the Private Information of Plaintiffs and Class Members. Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful conduct, and assert claims on behalf of the Class for Negligence (Count One), Breach of Implied Contract (Count Two), Unjust Enrichment (Count Three), Breach of Fiduciary Duty (Count Four), Violation of Washington's Consumer Protection Act, RCW 19.86.10, *et seq*. (Count Five), and Violation of Arizona's Consumer Fraud Act, A.R.S. §§ 44-1524, *et seq*. (Count Six).

## PARTIES

19.     Plaintiff Kurt Phillips is an adult individual and, at all relevant times herein, a resident and citizen of Washington, residing in Snohomish County, Washington.

20.     Plaintiff Michael Manson is an adult individual and, at all relevant times herein, a resident and citizen of Arizona, residing in Navajo County, Arizona.

21.     Plaintiff Thomas Graham is an adult individual and, at all relevant times herein, a resident and citizen of Texas, residing in Nueces County, Texas.

22.     Plaintiff Austin Kohl is an adult individual and, at all relevant times herein, a resident and citizen of Ohio, residing in Montgomery County, Ohio.

23.     Defendant Bay Bridge Administrators, LLC is a limited liability company organized and headquartered in Austin, Texas. Upon information and belief, the members of Bay Bridge Administrators, LLC are Clyde William Sommerlatte, Jr., James Robert Cozby, and Rex J. Anderson. Respectively, upon investigation of counsel, Clyde William Sommerlatte, Jr. and James Robert Cozby are domiciled in the state of Texas, where public records indicate they reside and intend to stay. Upon investigation of counsel, Rex J. Anderson is domiciled in the state of Kansas, where public records indicate he resides and intends to stay.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including several Plaintiffs, is a citizen of a state different from Defendant.

25.     This Court has general personal jurisdiction over Defendant BBA because its principal place of business is in this District and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

26.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District.

## FACTUAL ALLEGATIONS

*Background*

27.     Defendant Bay Bridge Administrators, LLC is a third-party administrator of employee insurance plans headquartered in Austin, Texas. The company oversees various employer-offered insurance products as a third-party administrator, and BBA assists employers with various administrative functions such as enrollment, invoicing, record keeping, and compliance.

28.     Defendant claims, "BBA takes the privacy and security of the personal information in our possession very seriously."[4]

29.     Defendant's Privacy Policy state, "Bay Bridge Administrators is committed to protecting your privacy and developing technology that gives you the most powerful and safe online experience."[5]

30.     Defendant's Privacy Policy states:

**Use of your Personal Information**

Bay Bridge Administrators collects and uses your personal information to operate the Bay Bridge Administrators Web site and deliver the services you have requested. Bay Bridge Administrators also uses your personally identifiable information to inform you of other products or services available from Bay Bridge Administrators and its affiliates. Bay Bridge Administrators may also contact you via surveys to conduct research about your opinion of current services or of potential new services that may be offered.

Bay Bridge Administrators does not sell, rent or lease its customer lists to third parties. Bay Bridge Administrators may, from time to time, contact

---

[4] https://dojmt.gov/wp-content/uploads/Consumer-Notification-Letter-785.pdf (last visited June 25, 2023).

[5] *Privacy Policy*, https://baybridge.wealthcareportal.com/Page/PrivacyPolicy (last visited June 25, 2023).

8

you on behalf of external business partners about a particular offering that may be of interest to you. In those cases, your unique personally identifiable information (e-mail, name, address, telephone number) is not transferred to the third party. In addition, Bay Bridge Administrators may share data with trusted partners to help us perform statistical analysis, send you email or postal mail, provide customer support, or arrange for deliveries. All such third parties are prohibited from using your personal information except to provide these services to WCP Site 2, and they are required to maintain the confidentiality of your information.

Bay Bridge Administrators does not use or disclose sensitive personal information, such as race, religion, or political affiliations, without your explicit consent.

Bay Bridge Administrators keeps track of the Web sites and pages our customers visit within WCP Site 2, in order to determine what Bay Bridge Administrators services are the most popular. This data is used to deliver customized content and advertising within Bay Bridge Administrators to customers whose behavior indicates that they are interested in a particular subject area.

Bay Bridge Administrators Web sites will disclose your personal information, without notice, only if required to do so by law or in the good faith belief that such action is necessary to: (a) conform to the edicts of the law or comply with legal process served on Bay Bridge Administrators or the site; (b) protect and defend the rights or property of WCP Site 2; and, (c) act under exigent circumstances to protect the personal safety of users of WCP Site 2, or the public.[6]

31.   Defendant's Privacy Policy also promises, "Bay Bridge Administrators secures your personal information from unauthorized access, use or disclosure. Bay Bridge Administrators secures the personally identifiable information you provide on computer servers in a controlled, secure environment, protected from unauthorized access, use or disclosure."[7]

---

[6] *Id.*

[7] *Id.*

9

*Defendant Acquires, Collects, and Stores the Private Information of Plaintiffs and Class Members*

32.     On information and belief, in the ordinary course of its business, BBA maintains the Private Information of consumers, including but not limited to:

- Name, address, phone number and email address;
- Date of birth;
- Demographic information;
- Social Security number;
- Financial information;
- Information relating to individual medical history;
- Information concerning an individual's doctor, nurse, or other medical providers;
- Medication information;
- Health insurance information;
- Photo identification;
- Employment information; and
- Other information that Defendant may deem necessary to administer its insurance products.

33.     Additionally, BBA may receive Private Information from other individuals and/or organizations including Plaintiff and Class Members' employers, insurance carriers, and in connection with enrollment in employee insurance benefit plans.

34.     Because of the highly sensitive and personal nature of the information Defendant acquires and stores with respect to consumers, BBA, upon information and belief, promises to, among other things; keep protected health information private; comply with insurance industry standards related to data security and Private Information, including HIPAA; inform consumers of

its legal duties and comply with all federal and state laws protecting consumer Private Information; only use and release Private Information for reasons that relate to medical care and treatment; and provide adequate notice to individuals if their Private Information is disclosed without authorization.

35.     At every step, BBA holds onto sensitive patient Private Information and has a duty to protect that Private Information from unauthorized access.

36.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

37.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

38.     Plaintiffs and the Class Members relied on Defendant to implement and follow adequate data security policies and protocols, to keep their Private Information confidential and securely maintained, to use such Private Information solely for insurance services and purposes, and to prevent the unauthorized disclosure of the Private Information.

### *The Cyberattack*

39.     On or about September 5, 2022, BBA experienced a network disruption consistent with a ransomware attack on its network.

40.     BBA took steps to secure its system and investigate the nature and scope of the incident on the network.

41.     Through its investigation, BBA determined that its network and servers were subject to a cyber-attack that impacted its network where information on its network was accessed

and acquired without authorization.

42.     The investigation determined that files on BBA's network were accessed by an unauthorized user on or about August 15, 2022 and exfiltrated from the network on or about September 3, 2022.[8]

43.     Upon information and belief, Plaintiffs' and Class Members' Private information was exfiltrated and stolen in the attack.

44.     Furthermore, the investigation determined that the accessed systems contained Private Information, which was accessible, unprotected, and vulnerable to acquisition and/or exfiltration by the unauthorized actor.

45.     The type of Private Information accessed by the unauthorized actor in the Data Breach includes names, dates of birth, Social Security numbers, driver's license numbers or state identification numbers, medical information, and health insurance information.

46.     While BBA stated in the Breach Notice that the unusual activity occurred and was discovered on September 5, 2022, BBA did not begin notifying victims until December 29, 2022, or even later—three months after they discovered the Data Breach occurred.

47.     Plaintiffs believe that their Private Information was likely subsequently sold on the Dark Web following the Data Breach, as that is the *modus operandi* of all cybercriminals. Articles about this Data Breach have warned victims that "it is not uncommon for stolen personal information to be traded on hacker marketplaces before being used for nefarious purposes."[9]

_____

[8] https://www.securityweek.com/251k-impacted-data-breach-insurance-firm-bay-bridge-administrators/ (last visited June 21, 2023).

[9] *Id.*

48.     Defendant had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

49.     Plaintiffs and Class Members provided their Private Information to Defendant or their insurance provider with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

50.     Through its Breach Notice, BBA also recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to take steps to mitigate their risk of identity theft, such as reviewing financial accounts, and reviewing credit reports for possible fraud.

51.     BBA has offered abbreviated credit monitoring services to victims thereby identifying the harm posed to Plaintiffs and Class Members as a result of the Data Breach, which does not adequately address the lifelong harm that victims face following the Data Breach. Indeed, the Breach involves Private Information that cannot be changed, such as Social Security numbers.

52.     Beginning on or around December 29, 2022, Defendant issued a Notice of Data Security Incident to Plaintiffs and Class Members (the "Notice of Data Breach"). In total, Defendant notified at least 251,000 individuals.[10]

---

[10] Ionut Arghire, *251k Impacted by Data Breach at Insurance Firm Baby Bridge Administrators*, SecurityWeek (Jan. 11, 2023), https://www.securityweek.com/251k-impacted-data-breach-insurance-firm-bay-bridge-administrators/ (last visited June 25, 2023).

53.     The Notice of Data Breach sent to Plaintiffs and Class Members including the following PII and PHI as being impacted by the Data Breach:

> [N]ame, address, Social Security number, driver's license or state identification card number, medical information, health insurance information, and/or date of birth. The personal and protected health information involved was shared with BBA either by the individual, the individual's employer, and/or the individual's insurance carrier(s), in connection with enrollment in an employment insurance benefit plan for calendar year 2022.

54.     As a result of the Data Breach, Plaintiffs and more than 251,000 Class Members suffered ascertainable losses in the form of the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack and the substantial and imminent risk of identity theft.

55.     As a result of this delayed response, Plaintiffs and Class Members had no idea their Private Information had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm. The risk will remain for their respective lifetimes.

56.     Defendant's failure to timely detect and report the Data Breach made its consumers vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Private Information.

57.     This Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the Private Information of Plaintiff and Class Members. In addition to Defendant's failure to prevent the Data Breach, after discovering the breach, Defendant waited several months to report it to government agencies and affected individuals.

58.     Despite recognizing its duty to do so, on information and belief, BBA has not implemented reasonably cybersecurity safeguards or policies to protect its consumers' Private Information or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, BBA leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to consumers' Private Information.

59.     Plaintiffs and Class Members directly or indirectly entrusted Defendant with sensitive and confidential information, including their Private Information which includes information that is static, does not change, and can be used to commit myriad financial crimes.

60.     Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand Defendant safeguard their Private Information.

61.     The unencrypted Private Information of Plaintiffs and Class Members will likely end up for sale on the dark web as that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members. In turn, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

62.      Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information.

63.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the insurance industry preceding the date of the breach.

64.      In light of recent high profile data breaches at other insurance partner and insurance companies, Defendant knew or should have known that their electronic records and consumers' Private Information would be targeted by cybercriminals and ransomware attack groups.

65.      In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[11] The 330 reported healthcare breaches in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breach that exposed nearly 10 million sensitive records (9,700,238) in 2020.[12]

66.      Indeed, cyberattacks on insurance-related companies like Defendant have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, potential attack.[13]

### Defendant Had an Obligation to Protect the Private Information

67.      Defendant's failure to adequately secure Plaintiffs and Class Members' Private Information breaches duties it owes Plaintiffs and Class Members under statutory and common law. Under HIPAA, health insurance providers have an affirmative duty to keep patients' Protected Health Information private. As a covered entity, Defendant has a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiffs and Class Members' data. Moreover, Plaintiffs and Class Members surrendered their highly sensitive personal data to Defendant under the implied condition that Defendant would keep it private and secure. Accordingly, Defendant

---

[11] *See* 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified (last visited June 25, 2023).

[12] *Id.*

[13]   *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited June 25, 2023).

also has an implied duty to safeguard their data, independent of any statute.

68.     Because Defendant is covered by HIPAA (45 C.F.R. § 160.102), it is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

69.     HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

70.     HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

71.     HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

72.     "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

73.     HIPAA's Security Rule requires Defendant to do the following:

   a.   Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

   b.   Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.  Ensure compliance by its workforce.

74.    HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

75.    Moreover, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

76.    Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. S*ee, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

77.    In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with

industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Plaintiffs and Class Members.

78.     Defendant owed a duty to Plaintiffs and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the Private Information in its possession was adequately secured and protected.

79.     Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including not sharing information with other entities who maintained substandard data security systems.

80.     Defendant owed a duty to Plaintiffs and Class Members to implement processes that would immediately detect a breach on its data security systems in a timely manner.

81.     Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

82.     Defendant owed a duty to Plaintiffs and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust this Private Information to Defendant.

83.     Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

84.     Defendant owed a duty to Plaintiffs and Class Members to encrypt and/or more reliably encrypt Plaintiffs' and Class Members' Private Information and monitor user behavior and activity in order to identify possible threats.

### Plaintiffs' Common Experiences

85.     As a requisite to receiving medical services, Plaintiffs individually and separately provided their Private Information to Defendant or their insurance provider and trusted that the information would be safeguarded according to state and federal law.

86.     Upon information and belief, Defendant obtained Plaintiffs' Private Information from Plaintiffs or their insurance providers. Defendant then entered and stored that Private Information on its network and systems.

87.     Plaintiffs are careful about sharing their sensitive Private Information. Plaintiffs have never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

88.     Plaintiffs store any documents containing their sensitive Private Information in a safe and secure location or destroy the documents. Moreover, Plaintiffs diligently choose unique usernames and passwords for their various online accounts.

89.     Plaintiffs have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business and medical purposes only, and to make only authorized disclosures of this information.

90.     The Notice Letters from Defendant notified Plaintiffs that its network had been accessed and Plaintiffs' Private Information may have been involved in the Data Breach, which included Plaintiffs' Private Information.

91.     Furthermore, Defendant's Notice Letter directed Plaintiffs to be vigilant and to take certain steps to protect their Private Information and otherwise mitigate their damages.

92.     As a result of the Data Breach, Plaintiffs heeded Defendant's warning and spent

time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring their accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach notice where Defendant advised Plaintiffs to mitigate their damages by, among other things, monitoring their accounts for fraudulent activity.

93.     Even with the best response, the harm caused to Plaintiffs cannot be undone.

94.     Plaintiffs have suffered invasions of privacy.

95.     Plaintiffs further suffered actual injury in the form of damages to and diminution in the value of Plaintiffs' Private Information—a form of intangible property that Plaintiffs entrusted to Defendant, which was compromised in and as a result of the Data Breach.

96.     Plaintiffs suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and have anxiety and increased concerns for the loss of their privacy.

97.     Plaintiffs have suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

98.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

99.     Plaintiffs have a continuing interest in ensuring that Plaintiffs' Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

**Plaintiffs' Individual Experiences**

*Plaintiff Kurt Phillips' Experience*

100.    Plaintiff Phillips is a customer of Defendant and/or has received certain services from Defendant.

101.    On or about December 29, 2022, Plaintiff Phillips was notified via letter from Defendant that Plaintiff Phillips' Private Information, including his name, Social Security number, driver's license or states identification number, date of birth, medical information, and health insurance information, had been taken as a result of the Data Breach.

102.    As a result of the Data Breach, Plaintiff Phillips spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and/or credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach Notice where Defendant advised Plaintiff Phillips to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

103.    Plaintiff Phillips is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Phillips stores any documents containing his Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Phillips diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

104.    Plaintiff Phillips only allowed Defendant to maintain, store, and use his Private

Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff Phillips' Private Information was within the possession and control of Defendant at the time of the Data Breach.

105.    Plaintiff Phillips' Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of multiple unauthorized or inaccurate hard inquiries to his credit reports.  Furthermore, Plaintiff Phillips has been notified that his Private Information has been found on the Dark Web after the Data Breach. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Phillips' life as a whole, and specifically caused great financial strain on him as a direct result of the Data Breach.

106.    Furthermore, Plaintiff Phillips has also experienced an increase in the number of spam calls and emails since the Data Breach.

107.    The Data Breach has also caused Plaintiff Phillips to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

108.    As a result of the actual harm he has already suffered and the substantial present risk of additional harm that he will face the rest of his life, Plaintiff Phillips spent valuable time freezing his credit reports with all three major credit bureaus.  As a result of the risk he faces, Plaintiff Phillips spent approximately $100 for credit monitoring services from TransUnion through May 2023 and, at Defendant's direction, signed up for the limited IDX credit monitoring services offered by Defendant.

109.    After being notified of the Data Breach, Plaintiff Phillips drove to his bank and closed his existing financial accounts and re-opened new financial accounts in his name. Plaintiff

Phillips also drove to another bank and opened a new financial account to further protect himself from the increased risk of future harm to his identity and finances. Plaintiff Phillips spent valuable time, paid money for gasoline, and suffered wear and tear on his automobile while driving to these banks to close and open accounts. In addition, Plaintiff Phillips lost access to his funds for approximately five business days when he was forced to wait for new debit cards to issue in his name when he opened new financial accounts in his name. Plaintiff Phillips also lost access to $25,000 of funds used to open his new financial account for several days because the bank placed a hold on the cashier's check Plaintiff Phillips used to deposit the funds into the newly created account.

110.    The loss of privacy and substantial present risk of additional imminent harm have both caused Plaintiff Phillips to suffer stress, fear, and anxiety as Plaintiff Phillips is very concerned that his sensitive Private Information is now in the hands of data thieves and shall remain that way for the remainder of his lifetime.

111.    Plaintiff Phillips is aware of no other source from which the theft of his Private Information could have come. He regularly takes steps to safeguard his own Private Information in his own control.

112.    Given the time Plaintiff Phillips has lost investigating this data breach, taking steps to understand its full scope, determining the appropriate remedial steps, contacting counsel, etc., coupled with Plaintiff Phillips' resultant and naturally foreseeable fears/concerns for the use of Plaintiff Phillips' valuable Private Information, the damages articulated more specifically above are far from the full extent of the harm thereto.

***Plaintiff Michael Manson's Experience***

113.    Plaintiff Manson is a customer of Defendant or has received certain services from

24

Defendant.

114.    On or about December 29, 2022, Plaintiff Manson was notified via letter from Defendant that Plaintiff Manson's Private Information, including his name, Social Security number, driver's license or states identification number, date of birth, medical information, and health insurance information, had been taken as a result of the Data Breach.

115.    As a result of the Data Breach, Plaintiff Manson spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and/or credit reports to monitor for fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach Notice where Defendant advised Plaintiff Manson to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

116.    Plaintiff Manson is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Manson stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Manson diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

117.    Plaintiff Manson only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff Manson's Private Information was

within the possession and control of Defendant at the time of the Data Breach.

118.    Plaintiff Manson's Private Information has already been stolen and misused as he has experienced incidents of fraud and identity theft. In or around April, 2023, Plaintiff Manson was notified by a credit monitoring service, Credit Karma, that an unauthorized third party fraudulently opened a Capital One Bank credit card and a Capital One Bank checking account in Plaintiff Manson's name without his authorization. Additionally, Plaintiff Manson has been notified by his credit monitoring services that his Private Information has been found on the Dark Web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Manson's life as a whole, and specifically caused great financial strain on him as a direct result of the Data Breach.

119.    Plaintiff Manson has also experienced an increase in the number of spam calls and emails since the Data Breach.  Additionally, Defendant has noticed an increased amount of online direct marketing related to suspicious financial products.

120.    The Data Breach has also caused Plaintiff Manson to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

121.    As a result of the actual harm he has suffered and the substantial present risk of additional harm, Plaintiff Manson spent valuable time freezing his credit reports with all three major credit bureaus. Plaintiff Manson has also spent time signing up for credit monitoring services from all three major credit bureaus.  Plaintiff Manson was forced to spend between three and four hours on the telephone with Capital One Bank to close his fraudulently opened credit card and checking account.

122.    The loss of privacy and substantial present risk of additional imminent harm have

26

both caused Plaintiff Manson to suffer stress, fear, and anxiety as Plaintiff is very concerned that his identity may be stolen anytime in the future and that he is in imminent danger of becoming a victim of additional credit card or financial fraud for the remainder of his life.

123.    Plaintiff Manson is aware of no other source from which the theft of his Private Information could have come. He regularly takes steps to safeguard his own Private Information in his own control.

124.    Given the time Plaintiff Manson has lost investigating this data breach, taking steps to understand its full scope, determining the appropriate remedial steps, contacting counsel, etc., coupled with Plaintiff Manson's resultant and naturally foreseeable fears/concerns for the use of Plaintiff Manson's valuable Private Information, the damages articulated more specifically above are far from the full extent of the harm thereto.

### Plaintiff Thomas Graham's Experience

125.    Plaintiff Graham is a customer of Defendant or has received certain services from Defendant.

126.    On or about December 29, 2022, Plaintiff Graham was notified via letter from Defendant that Plaintiff Graham's Private Information, including his name, Social Security number, driver's license or states identification number, date of birth, medical information, and health insurance information, had been taken as a result of the Data Breach.

127.    As a result of the Data Breach, Plaintiff Graham spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and/or credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach Notice where Defendant advised Plaintiff

Graham to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

128.   Plaintiff Graham is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff Graham stores any documents containing his Private Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Graham diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

129.   Plaintiff Graham only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff Graham's Private Information was within the possession and control of Defendant at the time of the Data Breach.

130.   Plaintiff Graham's Personal Information has already been stolen and misused as he has experienced incidents of fraud and identity theft.  In or around June 2023, Plaintiff Graham's eBay account was fraudulently accessed and hacked by an unauthorized third-party. Plaintiff Graham has also been notified by his credit monitoring service that his Private Information has been found on the Dark Web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff's life as a whole, and specifically caused great financial strain on him as a direct result of the Data Breach.

131.   Plaintiff Graham has also experienced an increase in the number of suspicious spam calls and emails since the Data Breach.

132. The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

133. As a result of the actual harm he has suffered and the substantial present risk of additional harm, Plaintiff Graham signed up and paid for credit monitoring service from McAfee at the cost of $140.00 every three years. Plaintiff Graham also signed up for the credit monitoring service Smart Credit at the cost of $180.00 per year. Additionally, Plaintiff Graham, at Defendant's direction, signed up for the abbreviated credit monitoring services, which was not automatically provided to Class Members and required Class Members to spent additional time signing up for the abbreviated credit monitoring.

134. The loss of privacy and substantial present risk of additional imminent harm have both caused Plaintiff Graham to suffer stress, fear, and anxiety as Plaintiff Graham is very concerned that his sensitive Private Information is now in the hands of cyber-criminals and shall remain that way for the remainder of his lifetime and there is nothing Plaintiff Graham can do to retrieve his stolen Private Information from the cyber-criminals.

135. Plaintiff Graham is aware of no other source from which the theft of his Private Information could have come. He regularly takes steps to safeguard his own Private Information in his own control.

136. Given the time Plaintiff Graham has lost investigating this data breach, taking steps to understand its full scope, determining the appropriate remedial steps, contacting counsel, etc., coupled with Plaintiff Graham's resultant and naturally foreseeable fears/concerns for the use of Plaintiff Graham's valuable Private Information, the damages articulated more specifically above are far from the full extent of the harm thereto.

*Plaintiff Austin Kohl's Experience*

137.    Plaintiff Kohl is a customer of Defendant or has received certain services from Defendant.

138.    On or about December 29, 2022, Plaintiff Kohl was notified via letter from Defendant that Plaintiff Kohl's Private Information, including his name, Social Security number, driver's license or states identification number, date of birth, medical information, and health insurance information, had been taken as a result of the Data Breach.

139.    Plaintiff Kohl also notified via letter from Defendant that his minor child's Private Information had been taken as a result of the Data Breach.

140.    As a result of the Data Breach, Plaintiff Kohl spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, self-monitoring his accounts and/or credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured. Moreover, this time was spent at Defendant's direction by way of the Data Breach Notice where Defendant advised Plaintiff Kohl to mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

141.    Plaintiff Kohl is a cautious person and is therefore very careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff Kohl stores any documents containing his Personal Information in a safe and secure location or destroys the documents. Moreover, Plaintiff Kohl diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

30

142.    Plaintiff Kohl only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff Kohl's Private Information was within the possession and control of Defendant at the time of the Data Breach.

143.    Plaintiff Kohl's Personal Information has already been stolen and misused as he has experienced incidents of fraud and identity theft so far in the form of multiple unauthorized or inaccurate hard inquiries to his credit reports.  Furthermore, Plaintiff Kohl has been notified that his Private Information has been found on the Dark Web. These actions by unauthorized criminal third parties have detrimentally impacted Plaintiff Kohl's life as a whole, and specifically caused great financial strain on him as a direct result of the Data Breach.

144.    Furthermore, Plaintiff Kohl has also experienced an increase in the number of spam calls and emails since the Data Breach.  Due to the increase in spam calls after the Data Breach, Plaintiff Kohl placed his telephone number on the national do not call list.

145.    The Data Breach has also caused Plaintiff Kohl to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

146.    As a result of the actual harm he has suffered and the substantial present risk of additional harm that he faces, Plaintiff Kohl has spent and continues to spend time monitoring his finances.  Plaintiff Kohl spends approximately thirty minutes per week checking his bank accounts for unauthorized activity and checks his credit report weekly.

147.    The loss of privacy and substantial present risk of additional harm have both caused Plaintiff Kohl to suffer stress, fear, and anxiety as Plaintiff is very concerned that his sensitive

31

Private Information is now in the hands of data thieves and shall remain that way for the remainder of his lifetime.  Plaintiff Kohl is also very concerned that his minor child's Private Information is also in the hands of data thieves and that his child will suffer imminent risks of fraud and identity theft for the remainder of his child's life.

148.   Plaintiff Kohl is aware of no other source from which the theft of his (or his minor child's) Private Information could have come. He regularly takes steps to safeguard his own Private Information in his control.

149.   Given the time Plaintiff Kohl has lost investigating this data breach, taking steps to understand its full scope, determining the appropriate remedial steps, contacting counsel, etc., coupled with Plaintiff Kohl's resultant and naturally foreseeable fears/concerns for the use of Plaintiff Kohl's valuable Private Information, the damages articulated more specifically above are far from the full extent of the harm thereto.

### *The Data Breach Was Foreseeable*

150.   At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

151.   Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

*Value of PII and PHI*

152.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[14] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

153.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

154.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[17]

---

[14] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited June 25, 2023).

[15] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited June 25, 2023).

[16] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 25, 2023).

[17] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:

155.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

156.    The fraudulent activity resulting from the Data Breach may not come to light for years.

157.    Theft of PHI is also gravely serious: a thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care.[18] "If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[19]

158.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

159.    Moreover, there may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting

---

https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited June 25, 2023).

[18] *See What to Know About Medical Identity Theft*, Fed. Trade Comm'n (2021), https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited June 25, 2023).

[19] *Id.*

from data breaches cannot necessarily rule out all future harm.[20]

160.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

161.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

162.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to potentially millions of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

163.    Defendant has acknowledged the risk and harm caused to Plaintiffs and Class Members as a result of the Data Breach. Defendant, to date, has offered Plaintiffs and Class Members abbreviated, non-automatic credit monitoring services. The limited credit monitoring is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the Private Information at issue here. Moreover, Defendant put the burden squarely on Plaintiffs and Class Members to enroll in the inadequate monitoring services.

---

[20]    *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited June 25, 2023).

*Defendant Failed to Properly Protect Plaintiffs' and Class Members' Private Information*

164.    Defendant could have prevented this Data Breach by properly securing and encrypting the systems containing the Private Information of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data, especially for individuals with whom it had not had a relationship for a period of time.

165.    Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to companies like Defendant to protect and secure sensitive data they possess.

166.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

167.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

168.    The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen,

---

[21] *See generally Fighting Identity Theft With the Red Flags Rule: A How-To Guide for Business*, FED. TRADE COMM., https://www.ftc.gov/business-guidance/resources/fighting-identity-theft-red-flags-rule-how-guide-business (last visited June 25, 2023).

fraudulent use of that information and damage to victims may continue for years.

169.   To prevent and detect unauthorized cyber-attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[22]

170.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up

---

[22] *Id.* at 3-4.

to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[23]

171.    To prevent and detect cyber-attacks, including the cyber-attack that resulted in the

Data Breach, Defendant could and should have implemented, as recommended by the Microsoft

Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

- Monitor for adversarial activities

---

[23] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), *available at* https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited June 25, 2023).

- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[24]

172.    Moreover, given that Defendant was storing the PII and PHI of Plaintiffs and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

173.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

174.    As a result of computer systems in need of security upgrades, inadequate procedures for handling email phishing attacks, viruses, malignant computer code, hacking attacks, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

175.    Because Defendant failed to properly protect and safeguard Plaintiffs' and Class Members' Private Information, an unauthorized third party was able to access Defendant's network, and access Defendant's database and system configuration files and exfiltrate that data.

---

[24] *See Human-operated ransomware attacks: A preventable disaster*, Microsoft (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited June 25, 2023).

***Defendant Failed to Comply with Industry Standards***

176.    As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

177.    Several best practices have been identified that at a minimum should be implemented by healthcare service providers like Defendant, including, but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

178.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

179.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

180.    The foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

41

181.    Upon information and belief, Defendant failed to comply with one or more of the foregoing industry standards.

***Defendant's Negligent Acts and Breaches***

182.    Defendant participated in and controlled the process of gathering the Private Information from Plaintiffs and Class Members.

183.    Defendant therefore assumed and otherwise owed duties and obligations to Plaintiffs and Class Members to take reasonable measures to protect the information, including the duty of oversight, training, instruction, testing of the data security policies and network systems. Defendant breached these obligations to Plaintiffs and Class Members and/or was otherwise negligent because it failed to properly implement data security systems and policies for its health providers network that would adequately safeguarded Plaintiffs' and Class Members' Private Information. Upon information and belief, Defendant's unlawful conduct included, but is not limited to, one or more of the following acts and/or omissions:

  a.   Failing to design and maintain an adequate data security system to reduce the risk of data breaches and protect Plaintiffs' and Class Members' Private Information;

  b.   Failing to properly monitor its data security systems for data security vulnerabilities and risk;

  c.   Failing to test and assess the adequacy of its data security system;

  d.   Failing to develop adequate training programs related to the proper handling of emails and email security practices;

  e.   Failing to put into develop and place uniform procedures and data security protections for its healthcare network;

  f.   Failing to adequately fund and allocate resources for the adequate design, operation, maintenance, and updating necessary to meet industry standards for data security protection;

  g.   Failing to ensure or otherwise require that it was compliant with FTC guidelines

for cybersecurity;

h.  Failing to ensure or otherwise require that it was adhering to one or more of industry standards for cybersecurity discussed above;

i.  Failing to implement or update antivirus and malware protection software in need of security updating;

j.  Failing to require encryption or adequate encryption on its data systems;

k.  Otherwise negligently and unlawfully failing to safeguard Plaintiffs' and Class Members' Private Information provided to Defendant, which in turn allowed cyberthieves to access its IT systems.

## **COMMON INJURIES & DAMAGES**

184.  As result of Defendant's ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

185.  Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution or loss of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

*The Risk of Identity Theft to Plaintiff and Class Members Is Present and Ongoing*

43

186.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

187.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

188.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

189.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[25] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is

---

[25]    Louis DeNicola, *What Is the Dark Web?*, Experian (May 12, 2021), https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited June 25, 2023).

ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[26] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

190.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the PII at issue here.[27] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[28] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[29]

191.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding

---

[26] *Id.*

[27] *What is the Dark Web?* – Microsoft 365 (July 15, 2022), https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited June 25, 2023).

[28] *Id.*; *see also* Louis DeNicola, *supra* note 25.

[29] *Id.*

payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[30]

What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

192.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[31]

193.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[32]

194.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that

---

[30] Social Security Administration, *Identity Theft and Your Social Security Number* (2021), available at: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 25, 2023).

[31] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited June 25, 2023).

[32] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited June 25, 2023).

year, resulting in more than $3.5 billion in losses to individuals and business victims.[33]

195.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[34] Defendant did not rapidly report to Plaintiff and the Class that their Private Information had been stolen.

196.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

197.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

198.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

199.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and

---

[33] *See 2019 Internet Crime Report*, FBI (Feb. 11, 2020), https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited June 25, 2023).
[34] *Id.*

amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[35]

200.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[36]

201.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[37]

202.    Defendant's failure to properly notify Plaintiffs and Class Members of the Data

---

[35] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), FTC (Dec. 7, 2009), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited June, 25, 2023).

[36] *See   generally*   https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited June 25, 2023).

[37] *See, e.g.*, *Protecting   Personal   Information:   A   Guide   for   Business*, FTC, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited June 25, 2023).

Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

203.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

204.    Thus, due to Defendants' admitted recognition of the actual and imminent risk of identity theft, Defendant offered Plaintiffs and Class Members non-automatic and abbreviated credit monitoring and identity protection services.

205.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

206.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the

damage to their good name and credit record."[38]

207.   Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[39]

208.   A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[40]

---

[38] *See* U.S. GOV'T ACCOUNTABILITY OFF., GAO-07-737, PERSONAL INFORMATION: DATA BREACHES ARE FREQUENT, BUT EVIDENCE OF RESULTING IDENTITY THEFT IS LIMITED; HOWEVER, THE FULL EXTENT IS UNKNOWN (2007) ("GAO Report"), available at https://www.gao.gov/new.items/d07737.pdf (last visited June 25, 2023).

[39] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last visited June 25, 2023).

[40] "Credit Card and ID Theft Statistics" by Jason Steele, 10/24/2017, at: https://web.archive.org/web/20190304002224/https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited June 25, 2023).



209.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[41] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

---

[41] *See* GAO Report, *supra* n. 20, at 2.

[42] *See* Federal Trade Commission, IdentityTheft.gov, https://www.identitytheft.gov/Steps (last

### *Diminution of Value of the Private Information*

210.    PII is a valuable property right.[43] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

211.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII/PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

212.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[44]

213.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data, such as PHI, sells for $50 and up on the Dark Web.[45]

214.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[46] In fact, the data marketplace

---

visited June 25, 2023).

[43] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[44] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited June 25, 2023).

[45] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited June 25, 2023).

[46] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak*, LA

is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[47, 48] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[49]

215.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and potential release onto the Dark Web, where it may soon be available and holds significant value for the threat actors.

***Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

216.    To date, Defendant has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach.

217.    The credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud. Defendant also places the burden squarely on Plaintiffs and Class Members by requiring them to independently sign up for that service, as opposed to automatically enrolling all victims of this Data Breach. This was strategically offered to Class Members on December 29, 2022 during the holidays.

---

Times (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers ((last visited June 25, 2023).

[47] https://datacoup.com/.

[48] https://digi.me/what-is-digime/.

[49]  Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited June 25, 2023).

218.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

219.     It must be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

220.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

221.     Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[50] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

---

[50] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited June 25, 2023).

222.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

223.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

### *Injunctive Relief Is Necessary to Protect against Future Data Breaches*

224.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

### CLASS ALLEGATIONS

225.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

226.    The Nationwide Class that Plaintiffs seek to represent is defined as follows:

All United States residents whose Private Information was actually or potentially accessed or acquired during the Data Breach event that is the subject of the Notice of Data Breach that Defendant published to Plaintiffs and other Class Members beginning on or around December 29, 2022 (the "Nationwide Class").

227.    In addition, Plaintiff Phillips also seeks to represent the following Subclass:

### Washington Subclass

All individuals within the State of Washington whose Private Information was actually or potentially accessed or acquired during the Data Breach event that is the subject of the Notice of Data Breach that Defendant published to Plaintiffs and other Class Members beginning on or around December 29, 2022 (the "Washington Subclass").

228.    In addition, Plaintiff Mason also seeks to represent the following Subclass:

**Arizona Subclass:**

All individuals within the State of Arizona whose Private Information was actually or potentially accessed or acquired during the Data Breach event that is the subject of the Notice of Data Breach that Defendant published to Plaintiffs and other Class Members beginning on or around December 29, 2022 (the "Arizona Subclass").

229.    The Nationwide Class, together with the Subclasses, are collectively referred to herein as the "Classes" or the "Class."

230.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

231.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

232.    <u>Numerosity</u>, Fed R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands, if not millions, of individuals whose Private Information may have been improperly accessed in the Data Breach, and each Class is apparently identifiable within Defendant's records.

233.  <u>Commonality</u>, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a.  Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b.  Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c.  Whether Defendant had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

d.  Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

e.  Whether and when Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.  Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

k.  Whether Defendant violated the consumer protection statutes invoked herein;

l.  Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m.  Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

234.  <u>Typicality</u>, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

235.  <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

236.  <u>Adequacy</u>, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action

vigorously.

237.     Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

238.     The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

239.     The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

240.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

241.    Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

242.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

243.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a.  Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    b.  Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.  Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

60

d.   Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.   Whether Defendant breached the implied contract;

f.   Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

i.   Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Putative Nationwide Rule 23 Class)**

244.   Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in 1 through 243.

245.   Plaintiffs and the Class entrusted Defendant with their Private Information.

246.   Plaintiffs and the Class entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for business purposes only, and/or not disclose their Private Information to unauthorized third parties.

247.   Defendant has full knowledge of the sensitivity of the Private Information and the

types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

248.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Private Information of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

249.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that the Private Information of Plaintiffs and the Class in Defendant's possession was adequately secured and protected.

250.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain pursuant to regulations.

251.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the Private Information of Plaintiffs and the Class.

252.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Class.  That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

253.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

254.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security

practices.

255.     Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

256.     Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Class. Defendant's misconduct included, but was not limited to, their failure to take the steps and opportunities to prevent the Data Breach as set forth herein.  Defendant's misconduct also included their decisions not to comply with industry standards for the safekeeping of the Private Information of Plaintiffs and the Class, including basic encryption techniques freely available to Defendant.

257.     Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

258.     Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

259.     Defendant had and continue to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

260.     Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the Private Information of Plaintiffs and the Class.

261.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

262.    Defendant, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the Private Information of Plaintiffs and the Class during the time the Private Information was within Defendant's possession or control.

263.    Defendant improperly and inadequately safeguarded the Private Information of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

264.    Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the Private Information of Plaintiffs and the Class in the face of increased risk of theft.

265.    Defendant, through its actions and/or omissions, unlawfully breached their duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of Private Information.

266.    Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove Private Information, they were no longer required to retain pursuant to regulations.

267.    Defendant, through its actions and/or omissions, unlawfully breached their duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

268.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Nationwide Class, the Private Information of Plaintiffs and the Class would not have been

compromised.

269.     There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Nationwide Class.  The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

270.     Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

271.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

272.     Defendant's violation of Section 5 of the FTC Act constitutes negligence.

273.     Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

274.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and

deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

275.   As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and continuing consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their Private Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information of Plaintiffs and the Class; and (viii) present and continuing costs in terms of time, effort, and money that has been and will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class.

276.   As a direct and proximate result of Defendant' negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

277.   Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private

Information, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

278.     As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**<u>COUNT II</u>**
**Breach of Implied Contract**
**(On behalf of Plaintiffs and the Putative Nationwide Rule 23 Class)**

279.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in 1 through 243.

280.     Plaintiffs and the Class entrusted their Private Information to Defendant. In doing so, Plaintiffs and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

281.     The statements in Defendant's Privacy Policy described herein support the existence of an implied contract.

282.     Plaintiffs and the Class fully performed their obligations under the implied contracts with Defendant.

283.     Defendant breached the implied contract they made with Plaintiffs and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiffs and the Class once their relationship ended, and by failing to provide timely and accurate notice to them that personal information was compromised as a result of the Data Breach.

284.     As a direct and proximate result of Defendant's above-described breach of implied

contract, Plaintiffs and the Class have suffered, and will continue to suffer, ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

285.     As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

**COUNT III**
**Unjust Enrichment**
**(On behalf of Plaintiffs and the Putative Nationwide Rule 23 Class)**

286.     Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in 1 through 243. Notwithstanding, Plaintiffs bring this claim in the alternative to any claim for breach of contractual obligations.

287.     Plaintiffs and Class Members conferred a monetary benefit on Defendant, by providing Defendant with their valuable Private Information.

288.     Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

289.     Defendant was also enriched from the value of Plaintiffs' and Class Members' Private Information. Private Information has independent value as a form of intangible property. Defendant also derives value from this information because it allows Defendant to operate its

business and generate revenue.

290.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

291.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

292.    Defendant acquired the monetary benefit and Private Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

293.    If Plaintiffs and Class Members knew that Defendant had not secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

294.    Plaintiffs and Class Members have no adequate remedy at law.

295.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach,

69

including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

296.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

297.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

## COUNT IV
### Breach of Fiduciary Duty
### (On Behalf of Plaintiffs and the Putative Nationwide Rule 23 Class)

298.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in 1 through 243.

299.    In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became guardian of Plaintiffs and Class Members' Private Information, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store

300.     Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its patients, in particular, to keep secure their Private Information.

301.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

302.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to encrypt or otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

303.     Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

304.     Defendant breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

305.     As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate

measures to protect the Private Information in its continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Defendant's services they received.

306.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and economic and non-economic losses.

**<u>COUNT V</u>**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiffs and the Putative Nationwide Rule 23 Class)**

307.    Plaintiff re-allege and incorporate by reference herein all of the allegations contained in 1 through 243.

308.    Every contract in this state has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

309.    Plaintiffs and Class Members have complied with and performed all conditions of their contracts with Defendant.

310.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII, failing to timely and accurately disclose the Data Breach to Plaintiffs and Class Members and continued acceptance of PII and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

311.    Defendant acted in bad faith and/or with malicious motive in denying Plaintiffs and

Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

**COUNT VI**
**Violation of the Washington Consumer Protection Act**
**RCW 19.86.10 *et seq*.**
**(On Behalf of Plaintiff Phillips and the Washington Subclass)**

312.    Plaintiff Phillips re-alleges and incorporates by reference herein all of the allegations contained in 1 through 243.

313.    The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce. The CPA does not define "unfair" or "deceptive." However, "[i]t is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters …." RCW 19.86.920. Defendant's conduct is substantially similar to that held to be "unfair" or "deceptive" under Section 5 of the FTC Act, 15 U.S.C. § 45.

314.    Defendant is a "person" as described in RCW 19.86.010(1).

315.    Defendant engages in "trade" and "commerce" as described in RCW 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

316.    In the course of conducting its business, Defendant committed "unfair acts or practices" by, among other things, knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff Phillips' and Washington Subclass's Private Information. Plaintiff Phillips and the Washington

Subclass reserve the right to allege other violations of law by Defendant constituting other unlawful business acts or practices. As described above, Defendant's unfair acts and practices are ongoing and continue to this date.

317.   These unfair acts have caused substantial injury to Plaintiff Phillips and the Washington Subclass because their Private Information has been exposed to cyber criminals who will commit identity theft and fraud. Plaintiffs and the Washington Subclass were unable to avoid Defendant servicing their accounts because Defendant was selected by its clients. Further, Defendant's unfair acts have no countervailing benefits; Plaintiffs and the Washington Subclass will not benefit from the exposure of their Private Information.

318.   Defendant's conduct was also deceptive. Defendant concealed from Plaintiff Phillips and Washington Subclass Members the unauthorized release and disclosure of their Private Information, and it failed to timely notify them of that unauthorized release and disclosure. If Plaintiff Phillips and Washington Subclass Members had been notified in an appropriate fashion, and had the information not been hidden from them, they could have taken precautions to safeguard and protect their Private Information.

319.   Defendant's above-described "unfair or deceptive acts or practices" affects the public interest because it is substantially injurious to persons and has the capacity to injure other persons.

320.   The gravity of Defendant's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Defendant's legitimate business interests other than engaging in the above-described wrongful conduct.

321.   Defendant's above-described unfair and deceptive acts and practices directly and proximately caused injury to Plaintiff Phillips' and Washington Subclass Members' business and

74

property. Plaintiff Phillips and Washington Subclass Members have suffered, and will continue to suffer, actual damages and injury in the form of, among other things, (1) an imminent, immediate, and continuing increased risk of identity theft and identity fraud—risks justifying expenditures for protective and remedial services for which Plaintiff Phillips and Washington Subclass Members are entitled to compensation; (2) invasion of privacy; (3) breach of the confidentiality of Plaintiff Phillips' and Washington Subclass Members' Private Information; (5) deprivation of the value of Plaintiff Phillips' and Washington Subclass Members' Private Information, for which there is a well-established national and international market; (6) the financial and temporal cost of monitoring credit, monitoring financial accounts, and mitigating damages; and/or (7) investment of substantial time and money to monitoring and remediating the harm inflicted upon them.

322.    Unless restrained and enjoined, Defendant will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff Phillips, therefore, on behalf of himself, Washington Subclass Members, and the general public, also seeks restitution and an injunction prohibiting Defendant from continuing such wrongful conduct and requiring Defendant to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect the Private Information entrusted to it.

323.    Plaintiff Phillips and Washington Subclass Members also seek to recover actual damages sustained by each Washington Subclass Member together with the costs of the suit, including reasonable attorneys' fees.

324.    In addition, Plaintiff Phillips, on behalf of himself and the Washington Subclass Members, requests that this Court use its discretion, pursuant to RCW 19.86.090, to increase the

damages award for each Class Member by three times the actual damages sustained, not to exceed $25,000.00 per Class Member.

## COUNT VII
**Arizona Consumer Fraud Act**
**A.R.S. §§ 44-1521, *et seq.***
**(On Behalf of Plaintiff Manson and the Arizona Subclass)**

325.    Plaintiff Manson re-alleges and incorporates by reference herein all of the allegations contained in 1 through 243.

326.    Defendant is a "person" as defined by A.R.S. § 44-1521(6).

327.    Defendant advertised, offered, or sold goods or services in Arizona and engaged in trade or commerce directly or indirectly affecting the people of Arizona.

328.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of "merchandise" (as defined in Arizona Consumer Fraud Act, A.R.S. § 44-1521(5)) in violation of A.R.S. § 44-1521(A), including:

    a.    Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff Manson's and Arizona Subclass Members' Private Information, which was a direct and proximate cause of the Data Breach;

    b.    Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

    c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Manson's and Arizona Subclass Members' Private Information, including duties imposed by 15 U.S.C. § 45 and 15 U.S.C. § 6801, *et*

*seq.*, which was a direct and proximate cause of the Data Breach;

d.  Misrepresenting that it would protect the privacy and confidentiality of Plaintiff Manson's and Arizona Subclass Members' Private Information, including by implementing and maintaining reasonable security measures;

e.  Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff Manson's and Arizona Subclass Members' Private Information, including duties imposed by 15 U.S.C. § 45 and 15 U.S.C. § 6801, *et seq.*; and,

f.  Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Arizona Subclass Members' PII, including duties imposed by 15 U.S.C. § 45 and 15 U.S.C. § 6801, *et seq.*

329.  Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' personal information. Documents containing such misrepresentations and omissions include the privacy policy cited in this complaint.

330.  Defendant intended to mislead Plaintiff Manson and Arizona Subclass Members and induce them to rely on its misrepresentations and omissions.

331.  Had Defendant disclosed to Plaintiff Manson and Arizona Subclass Members that its data systems were not secure and, thus, vulnerable to attack, Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the responsibility of being a "steward of data" while keeping the inadequate state of its security controls secret from the public. Accordingly, because

Defendant held itself out as having a duty of trustworthiness and care, Plaintiff Manson and Arizona Subclass Members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

332.    Defendant acted intentionally, knowingly, and maliciously to violate Arizona's Consumer Fraud Act, and recklessly disregarded Plaintiff Manson's and Arizona Subclass Members' rights. Defendant's numerous past data breaches put it on notice that its security and privacy protections were inadequate.

333.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiff Manson and Arizona Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their Private Information.

334.    Plaintiff Manson and Arizona Subclass Members seek all monetary and non-monetary relief allowed by law, including compensatory damages, disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Classes, and appointing Plaintiffs and their Counsel to represent the Classes;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of

Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

   i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

  ii.   requiring Defendant to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

 iii.   requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

 iv.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

  v.   prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

 vi.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly

correct any problems or issues detected by such third-party security auditors;

vii.   requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train their security personnel regarding any new or modified procedures;

ix.   requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.   requiring Defendant to conduct regular database scanning and securing checks;

xi.   requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xii.   requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.   requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting

personal identifying information;

    xiv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

    xv.   requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

    xvi.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including, but not limited to, actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: June 26, 2023                       Respectfully Submitted,

                                          s/ Joe Kendall
                                          JOE KENDALL
                                          Texas Bar No. 11260700
                                          **KENDALL LAW GROUP, PLLC**
                                          3811 Turtle Creek Blvd., Suite 1450
                                          Dallas, Texas 75219
                                          Phone:214-744-3000
                                          Fax: 214-744-3015
                                          jkendall@kendalllawgroup.com

                                          *Interim Local Counsel for Plaintiffs and Putative Rule 23 Class*

                                          Terence R. Coates (admitted *pro hac vice*)
                                          Justin C. Walker (admitted *pro hac vice*)
                                          Jonathan T. Deters (admitted *pro hac vice*)
                                          **MARKOVITS, STOCK & DEMARCO, LLC**
                                          119 East Court Street, Suite 530
                                          Cincinnati, OH 45202
                                          Phone: (513) 651-3700
                                          Fax: (513) 665-0219
                                          tcoates@msdlegal.com
                                          jwalker@msdlegal.com
                                          jdeters@msdlegal.com

                                          *Interim Class Counsel for Plaintiffs and Putative Rule 23 Class*

                                          Bryan L. Bleichner (admitted *pro hac vice*)
                                          Philip J. Krzeski (admitted *pro hac vice*)
                                          **CHESTNUT CAMBRONNE PA**
                                          100 Washington Avenue South, Suite 1700
                                          Minneapolis, MN 55401
                                          Phone: (612) 339-7300
                                          Fax: (612) 336-2940
                                          bbleichner@chestnutcambronne.com
                                          pkrzeski@chestnutcambronne.com

                                          Gary E. Mason (admitted *pro hac vice*)

82

Danielle L. Perry (admitted *pro hac vice*)
Lisa A. White (admitted *pro hac vice*)
**Mason LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Phone: (202) 429-2290
gmason@masonllp.com
dperry@masonllp.com

*Interim Executive Committee Counsel for Plaintiffs
and Putative Rule 23 Class*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record

on June 26, 2023 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
JOE KENDALL

83